# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY IN AID OF A FOREIGN PROCEEDING | Case No.: |

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY IN AID OF A FOREIGN PROCEEDING

*Of Counsel:*

Michael Jason Lee, Esq.
LAW OFFICES OF MICHAEL
JASON LEE, APLC
4660 La Jolla Village Drive, Suite 100
San Diego, California 92122
(858) 550-9984
michael@mjllaw.com

William James Kraus, Esq.
BUTZEL LONG, PC
301 East Liberty Street, Suite 500
Ann Arbor, Michigan 48104
(734) 995-3110
krausw@butzel.com

(*Pro Hac Vice Applications Forthcoming*)

**BAYARD, P.A.**

Brett M. McCartney (No. 5208)
Elizabeth A. Powers (No. 5522)
600 North King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
bmmcartney@bayardlaw.com
epowers@bayardlaw.com

*Attorneys for Applicant*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

STATEMENT OF FACTS ........................................................................................................2

    A.    Introduction to Bitcoin Transactions ...................................................................2

    B.    The Theft of Applicant's Assets ..........................................................................3

    C.    The March 24, 2021 Transfer of the Stolen BTC and the April 17, 2021 Deposit to Binance ..................................................................................................4

    D.    The April 25, 2021 Deposit to Huobi ..................................................................5

    E.    Analysis of the Exchange Productions and Connection to Respondent Coinbase ................................................................................................................5

    F.    THE CONTEMPLATED DISCOVERY ............................................................9

ARGUMENT ............................................................................................................................10

    I.    THE APPLICATION SATISFIES SECTION 1782'S REQUIREMENTS ..........10

        A.    Applicant is an "Interested Person" ............................................................11

        B.    The Requested Discovery Is for Use in Conjunction with Proceedings Before a Foreign Tribunal ........................................................11

        C.    Coinbase Can Be Found in Delaware ........................................................11

    II.    Discretionary Considerations Merit Granting This Application ............................12

CONCLUSION .........................................................................................................................16

# TABLE OF AUTHORITIES

**Cases**                                                                                                                      **Page**

*In re Application for Discovery for Use in Foreign Proceeding*
    *Pursuant to 28 U.S.C. § 1782*,
    2019 WL 168828 (D.N.J. Jan. 10, 2019) ..................................................................................14

*In re Application of Gilead Pharmasset LLC*,
    2015 WL 1903957 (D. Del. Apr. 14, 2015) ..........................................................................12, 14

*In re Application Pursuant to 28 U.S.C. § 1782 of Michael Page do Brasil Ltda.*,
    2018 WL 7018716 (D.N.J. Jan. 19, 2018) ........................................................................... 15

*In re Batbold*,
    2021 WL 4596536 (S.D.N.Y. Oct. 6, 2021) ...........................................................................13

*In re Bayer AG*,
    146 F.3d 188 (3d Cir. 1998) ...................................................................................................11

*In re Biomet Orthopaedics Switzerland GmBh*,
    742 Fed. Appx. 690 (3d Cir. 2018) ........................................................................................11

*In re Biomet*,
    2021 WL 3793901 (D. Del. Aug 26, 2021) ...........................................................................13

*In re Euromepa S.A.*,
    51 F.3d 1095 (2d Cir. 1995) ...................................................................................................14

*In re Ex Parte Application of Eni S.p.A. for an Order Pursuant*
    *to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery*
        *for Use in Foreign Proceedings*,
        2021 WL 1063390 (D. Del. Mar. 19, 2021) ....................................................................14

*In re Ex Parte Application of Societe d'Etude de Realisation*
    *et d'Exploitation Pour Le Traitement De Mais*,
    2013 WL 6164435 (E.D. Pa. Nov. 22, 2013) ............................................................. 15-16

*In re First Monolith Inc.*,
    2021 WL 1093658 (S.D.N.Y. Feb. 1, 2021) ..........................................................................13

*In re O'Keeffe*,
    646 Fed. Appx. 263 (3d Cir. 2016) .......................................................................................13

*In re Servicio Pan Americano de Proteccion*,
    354 F. Supp. 2d 269 (S.D.N.Y. 2004) ...................................................................................14

*Brandi-Dohorn v. IKB Deutsch Industriebank AG*,
    673 F.3d 76 (2d Cir. 2012) .......................................................................................... 15

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) ............................................................................................. *passim*

*John Deere Ltd. v. Sperry Corp.*,
    754 F.2d 132 (3d Cir. 1985) ........................................................................................ 11

**Rules and Statutes**

28 U.S.C. § 1782(a) .............................................................................................................. 10

Applicant Daniel Hindin (referred to hereafter as "Applicant"), by and through his undersigned counsel, respectfully submits this Memorandum of Law in Support of his Application for an Order Pursuant to 28 U.S.C § 1782 to Conduct Discovery in Aid of a Foreign Proceeding (the "Application"). Applicant seeks discovery in this District for use in a foreign proceeding currently underway in Singapore.

## INTRODUCTION

Applicant seeks the assistance of this Court in obtaining discovery for use in a foreign proceeding currently underway in Singapore. In this proceeding, Applicant seeks to recover bitcoin that were stolen from him in January 2021. As set forth further herein, Respondent Coinbase, Inc. ("Coinbase" or "Respondent") is believed to possess information relevant to the theft and recovery of Applicant's assets.

Specifically, in April 2021, Applicant's stolen assets were traced using publicly available blockchain records to several digital asset exchanges.[1] In an effort to preserve those assets and determine the identity of the person or persons who stole them, Applicant obtained an injunctive and discovery order in Singapore (where the exchanges at issue are found). As set forth further herein, that order led to the discovery of information that indicates that after some of the stolen assets were withdrawn from one of the Singaporean exchanges, they were ultimately deposited with Respondent (a U.S. based digital asset exchange).

Through the instant application, Applicant seeks the aid of this Court in obtaining discovery from Respondent concerning the account(s) and account holder(s) that received the stolen assets on Coinbase.

---

[1] Generally speaking, a "digital asset exchange" is an online platform through which customers can buy, sell, and otherwise trade, digital assets (a/k/a "cryptocurrencies").

## STATEMENT OF FACTS

### A. Introduction to Bitcoin Transactions

Bitcoin ("BTC") is a digital asset that is sent and received between users electronically. Unlike traditional assets, BTC is not controlled by any financial institution or government, and there are no physical BTC. Rather, BTC exists on a publicly available ledger known as blockchain that provides an immutable record of every BTC transaction to have ever taken place. The records contained on the blockchain provide verification of the amount of BTC each user is entitled to, as well as their transactions with other users.

In terms of mechanics, BTC is sent between users electronically by sharing public addresses on the blockchain. These addresses are represented by a string of numbers and letters (e.g., 34xp4vRoCGJym3xR7yCVPFHoCNxv4Twseo), and can be loosely be thought of like an account number. Unlike traditional bank accounts, however, all transactions to and from a given address can be viewed on the public blockchain.[2]

At the same time, BTC addresses employ one or more "private keys" that are known only to the address owner. The private key functions like a signature, confirming that any given transaction is authorized by the address owner. Together, the public address and private key can be referred to as a "wallet." Private keys are also represented by a string of numbers and letters, and must be safeguarded by the wallet owner. Indeed, anyone in possession of the private key has the ability to access (and transfer BTC from) the wallet it is linked to. Likewise, losing the private key means that the funds held in the address cannot be accessed.

---

[2] *See, e.g.,* Blockchain.com Bitcoin Explorer, *available at* https://www.blockchain.com/btc/address/34xp4vRoCGJym3xR7yCVPFHoCNxv4Twseo.

Given the risk of loss, access to a private key can be restored through use of a "recovery seed" or "recovery phrase." Most commonly, recovery phrases are a precise sequence of 12 or 24 words such as the following:

> airport amazing practice feed enjoy open enrich creek road again ice least

As a safeguard, digital asset users are strongly encouraged to make a copy of their recovery phrase if they need to restore access to their funds. Unfortunately, in the same way that a recovery phrase can be used by a user to restore access to their BTC wallet, a stolen recovery phrase can be used by a bad actor to access that same wallet.

### B. The Theft of Applicant's Assets

On January 8, 2021, Applicant discovered that BTC he had stored in public addresses under his control had been withdrawn without his knowledge or consent. (Declaration of Daniel Hindin ("Applicant Decl.") ¶ 2.) Forensic analysis of the electronic records generated by the transactions revealed that the individual or individuals responsible for the theft accessed "mobile wallets" used by Applicant to access his funds, utilizing a Virtual Private Network (VPN) to mask their location. (*Id*. ¶ 3.) The individual or individuals then withdrew Applicant's BTC to new public addresses shortly thereafter, seemingly using Applicant's recovery phrases to gain access to Applicant's funds.

The initial movements of the stolen bitcoin are set forth in greater detail in Figure 1. That infographic shows that on January 8th, the public addresses belonging to Applicant were emptied with the funds transferred to two new off-exchange addresses without Applicant's authorization ("bc1qzh" and "bc1qrx"). At that time, all major exchanges were notified that these BTC were

the proceeds of a theft, and Applicant—by and through counsel and a third-party investigative firm—have since been tracking their movements.



*Figure 1*

**C.    The March 24, 2021 Transfer of the Stolen BTC and the April 17, 2021 Deposit to Binance**

As shown in Figure 1, the stolen BTC were then transferred on March 24, 2021, in nearly simultaneous transactions to new off-exchange[3] wallets "bc1ql" and "bc1qhn." Following the March 24, 2021 transfers, the stolen BTC remained static until April 17, 2021, when some of the

---

[3] Here, "off-exchange" simply means an address that is not associated with a digital asset exchange.

BTC were sent from wallet bc1qhn to a deposit address known to be associated with the Binance digital asset exchange.

Following the deposit, a temporary freeze of the stolen assets was immediately provided by Binance. Shortly thereafter, on May 27, 2021, Applicant—acting by and through the law firm of Rajah & Tann Singapore LLP—sought injunctive relief against Binance in the General Division of the High Court of the Republic of Singapore. By Order dated June 8, 2021, the Singaporean court issued a sealed injunction and disclosure order making the freeze permanent and providing that Binance disclose all information it collected and maintained regarding the owner of the relevant accounts and their account activity. (Declaration of Michael Lee ("Lee Decl.") ¶ 3.) On June 10 and 16, 2021, Binance produced data in response to the Order issued by the Singaporean court. Since that time, the Singapore court has issued numerous discovery and freeze orders, including to Respondent's international affiliate, with the most recent Order issued to an exchange in receipt of Applicant's stolen assets earlier this month.

### D. The April 25, 2021 Deposit to Huobi

Next, on April 25, 2021, 0.3 BTC of Applicant's stolen assets were sent to the Huobi exchange. (*Id*. ¶ 4.) As with Binance, Huobi was likewise ordered under the sealed injunction and disclosure order from the Singaporean court to disclose all information it collected and maintained regarding the owner of the relevant accounts. (*Id.*) On June 10 and 16, 2021, Huobi produced data in response to the Order from the General Division of the High Court of the Republic of Singapore.

### E. Analysis of the Exchange Productions and Connection to Respondent Coinbase

In short, the document productions received from the exchanges revealed that:

- The accounts at Binance and Huobi were created in quick succession (March 29,

5

- 2021 and April 20, 2021, respectively) with the second account being opened after the first was frozen.

- The accounts were ostensibly created by a Ukrainian national and Russian national whose identities are believed to have been stolen and/or sold through a darkweb marketplace.

- Both of the exchange accounts appear to have been created for the purpose of either rapidly exchanging the stolen BTC for either other digital assets, or for laundering the stolen BTC in an effort to prevent tracing.[4]

(*Id.* ¶ 5.) On this last point, records produced by the Singaporean exchange Huobi show that 0.2 BTC of Applicant's stolen BTC was deposited to Huobi at 1:32 UTC on April 25, 2021, with 0.0996 BTC withdrawn eleven minutes later to an off-exchange address beginning with bc1qw- ("bc1qw"). (*Id.* ¶ 6.)

Those funds remained static until June 27, 2021, at which time 0.06 of the 0.0996 BTC was sent from bc1qw to an off-exchange address beginning with bc1q9- ("bc1q9"). (*Id.* ¶ 7.) The following day (June 28), 0.06 BTC was sent from bc1q9 to a deposit address associated with Respondent (beginning with 3MsUr-). (*Id.*) These transmissions are reflected visually in Figure 2:

---

[4] To explain, while the publicly available blockchain can be used to trace digital assets like BTC as they are transferred from one address to another, it becomes very difficult to trace assets once they are mixed with the assets of others on an exchange (e.g., like tracing a specific $20 bill once deposited to a bank). Likewise, without the benefit of information provided by the relevant exchange (as Applicant has here), it would be essentially impossible to discern whether the funds leaving an exchange (e.g., like if that specific $20 bill was remitted to a bank customer) belonged to Applicant.



*Figure 2*

Notably, the 0.01 BTC in change[5] from the first Coinbase deposit was sent to address bc1qudqhlaxt583q3st8vscham4hhplkzqg4h3w48t ("bc1qu"), where it was likewise deposited five hours later to Coinbase deposit address 3LQp8. (*Id.* ¶ 8.) Taken together, both Coinbase deposits are shown below in Figure 3.



*Figure 3*

---

[5] Like providing a cashier a $10 bill for a $9.50 item, BTC transactions that do not spend the entire amount in the wallet generate "change." That "change" is automatically sent back to the owner/payor and placed in a new "change" address associated with the original wallet.

Following that transmission, several additional transactions tracing back to the bc1qu address (and necessarily, Applicant's stolen BTC) occurred. (*Id.* ¶ 9.) Those transactions need not be individually described here (although a visual representation is provided in Figure 4). For purposes of this matter, however, it was determined that on July 9, 2021 a third and final deposit was made to a deposit address at Respondent (beginning in 327vp-) involving a portion of Applicant's stolen assets. (*Id.*)



*Figure 4*

Taken together, the foregoing records establish that: a) a portion of Applicant's stolen BTC was sent to Huobi; b) some of that BTC was able to be withdrawn from Huobi prior to the account freeze; and c) a portion of that withdrawn BTC has been deposited (in three separate instances) to Respondent.

Having discovered the foregoing, counsel for Applicant informally requested on July 16, 2021 that Respondent freeze the accounts receiving the stolen assets pending formal legal process. (*Id.* ¶ 10.) On July 20, 2021, Respondent responded that it would require a properly issued subpoena or court order to preserve the assets at issue and/or provide information related to the accounts. (*Id.*) Respondent seemingly did not dispute that the three addresses identified above were controlled by Coinbase and stated that one of the addresses still held assets at the time of the response. (*Id.*)

Accordingly, Applicant sought relief from the General Division of the High Court of the Republic of Singapore, obtaining a discovery order directed to Coinbase Global, Inc. (the

international Coinbase affiliate present in Singapore). Applicant's Singaporean counsel then attempted service of the Order for several weeks, before ultimately requesting that U.S. counsel serve the order on Respondent.

From November 2021 through February 2022, counsel for Applicant and Respondent engaged in informal discussions regarding the Order in an effort to avoid further judicial action. (*Id.* ¶ 11.) At bottom, Respondent's position was (and presumably still is) that "[t]he accounts connected to the addresses provided by you are affiliated with [Respondent] Coinbase, Inc., a US corporation incorporated in the state of Delaware [as opposed to Coinbase Global]. Per our privacy policy and applicable privacy laws, in order to disclose information about an account and/or freeze an account, Coinbase, Inc must be served a valid, enforceable court order from a court that has jurisdiction over Coinbase, Inc."[6] (*Id.*) In other words, because the account(s) receiving the stolen assets were ultimately discovered to be associated with *a United States customer* (as opposed to a *non-United States customer*), Respondent took the position that: a) Coinbase Global did not possess the records ordered to be produced; and b) Coinbase Inc. (which did possess the records) was not bound by the Singapore order. This "Catch-22" ultimately necessitated the current Application.

### F. THE CONTEMPLATED DISCOVERY

Applicant now seeks the assistance of this Court in obtaining information critical to its efforts to recover stolen assets. (*Id.* ¶ 12.) A copy of Applicant's proposed requests and subpoena to Coinbase are attached to the Application as **Exhibit 1.**

As referenced above, discovery produced by Huobi pursuant to an order of the General Division of the High Court of the Republic of Singapore, along with analysis of publicly available

---

[6] Respondent also initially raised objections related to whether service as affected under Singapore law was appropriate under U.S. law.

blockchain records, has enabled a portion of Applicant's stolen assets to be traced to Respondent's digital asset exchange. (Lee Decl. ¶ 13.) As has been the case with peer exchanges Binance and Huobi, it is believed that Coinbase maintains at least the following information related to the deposits at issue:

- Identity information regarding the account holder, such as legal name, address, contact information, and government issued ID;

- Transaction history, including detailed information regarding deposits, withdrawals, and trading activity on Coinbase;

- Account history, such as account creation date, correspondence, two-factor authentication usage, and current holdings; and

- Login and other technical information, such as IP addresses, geolocation data, approved devices and browser/device access logs.

(*Id.* ¶ 14.) The likelihood of Respondent possessing this information is particularly high given that Coinbase is subject to, and compliant with, extensive U.S. regulation (e.g., the Bank Secrecy Act, the USA Patriot Act). (*Id.* ¶ 15.) Respondent has likewise confirmed that a U.S. customer is associated with the address receiving the stolen assets as support for their contention that a U.S. subpoena directed to Coinbase Inc. was required for compliance.

## ARGUMENT

**I. THE APPLICATION SATISFIES SECTION 1782'S REQUIREMENTS**

28 U.S.C. § 1782(a) provides:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal…. The order may be made pursuant to ... the application of any interested person….

The fundamental purpose of Section 1782 is to provide a procedure whereby a qualified applicant may obtain "federal-court assistance in gathering evidence for use in foreign tribunals." *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 247 (2004). "Any interested person"

includes litigants before foreign or international tribunals, and includes corporate entities as well as natural persons. *Id*. at 256.

The policy behind Section 1782 is to "assist foreign tribunals in obtaining relevant information that the tribunals may find useful, but, for reasons having no bearing on international comity, they cannot obtain under their own laws." *Id.* at 262. The "prima facie showing mandated by the statute is that the application be made (1) 'by a foreign or international tribunal' or 'any interested person,' (2) that it be 'for use in a proceeding in a foreign or international tribunal,' and (3) that the person or entity from whom the discovery is sought be a resident of or be found in the district in which the application is filed." *In re Bayer AG*, 146 F.3d 188, 193 (3d Cir. 1998); *see also In re Biomet Orthopaedics Switzerland GmBh,* 742 Fed. Appx. 690, (3d Cir. 2018).

### A.     Applicant is an "Interested Person"

As a Plaintiff in a foreign action (*Hindin v. Persons Unknown*, HC/S 470/2021; HC/SUM 2444/2021 (Gen. Div. of the High Court of the Rep. of Singapore)), Applicant satisfies the "interested person" requirement of Section 1782. *See Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke Section 1782."); *see also John Deere Ltd. v. Sperry Corp.*, 754 F.2d 132 (3d Cir. 1985) (a party to foreign litigation is an interested person under Section 1782).

### B.     The Requested Discovery Is for Use in Conjunction with Proceedings Before a Foreign Tribunal

As discussed above, Applicant seeks discovery from Coinbase to assist in the tracing and recovery of the stolen assets. Such information is directly sought "for use in a proceeding in a foreign or international tribunal"—namely, an active proceeding in Singapore—as required by Section 1782.

### C.     Coinbase Can Be Found in Delaware

Coinbase is a publicly traded Delaware corporation with The Corporation Trust Company, located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, serving as its registered agent. (Lee Decl. ¶ 16.) Therefore, Coinbase is within this Court's jurisdiction and subject to its authority over the requested discovery sought in this Application. *See In re Application of Gilead Pharmasset LLC*, 2015 WL 1903957, at *2 (D. Del. Apr. 14, 2015) ("AbbVie is incorporated under the laws of Delaware, and is therefore within the jurisdictional reach of this court.").

## II. Discretionary Considerations Merit Granting This Application

In addition, certain discretionary factors that "bear consideration in a ruling on a § 1782 request" also favor granting the instant Application. *See Intel*, 542 U.S. at 264-65. These include:

(1) Whether the person from whom discovery is sought is a non-participant to the foreign proceeding thereby making the need for the aid more apparent;

(2) The nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or court abroad to federal court judicial assistance;

(3) Whether the Section 1782 application for discovery is an attempt to circumvent the foreign proceeding or undermine foreign laws;

(4) Whether granting discovery that is narrowly tailored is consistent with the aims of the statute to promote efficiency and reciprocity.

"A court should apply these factors in support of § 1782's 'twin aims' of 'providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts.'" *In re Biomet*, 2021 WL 3793901, at *1 (D. Del. Aug 26, 2021). Here, each of these discretionary factors weighs in favor of granting the Application.

First, Applicant's need for the discovery from Respondent by means of Section 1782(a) is heightened by the fact that it is not a party to the proceedings currently occurring in Singapore (and has steadfastly claimed that it cannot be reached by Singaporean courts). As the Supreme

Court noted: "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Intel,* 542 U.S. at 264-65. As such, relief under Section 1782(a) may not be warranted where the relevant tribunal does not need the assistance. *Id.* In contrast, here, Respondent possesses evidence relevant in the foreign proceedings, but will not (and seemingly cannot) be a party there. Indeed, Respondent will not be brought before any foreign tribunal for the purpose of obtaining the evidence currently in its possession. *See Intel,* 542 U.S. at 264 (noting that "nonparticipants in foreign proceedings may be outside the foreign tribunal's jurisdictional reach; thus, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid"). Nonetheless, documents in its possession are squarely relevant to Applicant's claims before the foreign tribunals. This weighs in favor of granting the Application.

Second, consistent with other courts' findings, there is no reason to believe that the High Court of the Republic of Singapore would be unreceptive to this Court's grant of the discovery sought. *See, e.g., In re Batbold*, 2021 WL 4596536, at *4 (S.D.N.Y. Oct. 6, 2021) (noting that "the courts in the United Kingdom [and] Singapore . . . are . . . receptive to Section 1782 discovery"); *In re First Monolith Inc.*, 2021 WL 1093658, at *2 (S.D.N.Y. Feb. 1, 2021) ("[I]t appears that the Singapore High Courts would likely be receptive to the requests[.]")

This conclusion is supported by the fact that Singapore is a party to the Hague Evidence Convention, which suggests that its tribunals are receptive to U.S. federal judicial assistance. *See In re O'Keeffe*, 646 Fed. Appx. 263, 267-68 (3d Cir. 2016) (affirming district court's finding that "the Hong Kong court is likely 'receptive to American judicial assistance'" because "Hong Kong is a signatory to the Hague Evidence Convention"); *In re Application for Discovery for Use in Foreign Proceeding Pursuant to 28 U.S.C. § 1782*, 2019 WL 168828, at *10 (D.N.J. Jan. 10, 2019) (explaining that "the receptivity of a foreign court to U.S. federal judicial assistance may

be inferred from its assent to treaties that promote such cooperation"); *In re Servicio Pan Americano de Proteccion*, 354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004) (noting that "Venezuela has indicated its receptivity to federal judicial assistance by its signature of treaties facilitating such cooperation"). Therefore, there is no reason to believe that those courts would object to this Court's assistance with discovery that will, by providing information concerning the deposit of Applicant's funds, facilitate the foreign proceedings and the potential recovery of the stolen funds.

Further, this Court has held that the liberal policy of granting assistance favors allowing a petitioner the discovery sought so that the foreign court itself may determine the admissibility or relevance of the evidence obtained. *See In re Ex Parte Application of Eni S.p.A. for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings,* 2021 WL 1063390, at * (D. Del. Mar. 19, 2021) ("[Section] 1782 does not authorize a district court to substitute its own assessment of admissibility or discoverability for that of a foreign tribunal."); *In re Application of Gilead,* 2015 WL 1903957, at *3 ("[T]he court makes no determination as to whether the foreign courts in this case will, or should, accept the documents and depositions that would result from granting Gilead's § 1782 application. Rather, the court need only assess whether AbbVie has satisfied its burden to show the foreign courts will not be receptive to this court's judicial assistance."); *see also In re Euromepa S.A.*, 51 F.3d 1095, 1099-1100 (2d Cir. 1995) (explaining that "a district court's inquiry into the discoverability of requested materials should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782," and that "[a]bsent this type of clear directive, however, a district court's ruling should be informed by section 1782's overarching interest in 'providing equitable and efficacious procedures for the benefit of tribunals and litigants involved in litigation with international aspects.'").

Third, the discovery is centrally relevant to the foreign proceedings, and would not conflict with or circumvent any foreign proof-gathering restrictions. Courts have interpreted this discretionary factor as an inquiry into the petitioner's good faith: "[A] district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign-proof gathering restriction or other policies of a foreign country or the United States." *Intel,* 542 U.S. at 264-65; *see also In re Application Pursuant to 28 U.S.C. § 1782 of Michael Page do Brasil Ltda.,* 2018 WL 7018716, at *8 (D.N.J. Jan. 19, 2018). Applicant's request here is made in good faith, and not for purposes of harassment or to side-step the foreign tribunals' discovery rules. *See Brandi-Dohorn v. IKB Deutsch Industriebank AG,* 673 F.3d 76, 81 (2d Cir. 2012). Indeed, Respondent has itself requested that Applicant obtain this relief. Thus, 28 U.S.C. § 1782 is a proper and necessary method by which to obtain the critical evidence sought by Applicant.

Fourth and finally, any discovery under the subpoenas will not be onerous for Respondent. Courts may consider whether the discovery requests under Section 1782 are "unduly intrusive or burdensome" and should be "rejected or trimmed." *Intel,* 542 U.S. at 265. In this instance, Applicant's requests are narrowly tailored to seek information and documents from Respondent concerning a discrete account or small number of accounts associated with Respondent that are in receipt of the stolen funds. Such information will help Applicant trace the stolen assets and identify the perpetrator(s). It is unlikely that such information or documentation would be voluminous or difficult to search for and produce; to the contrary, Respondent has seemingly already collected and reviewed the requested materials insomuch as the documents themselves formed the basis for Respondent's objection to the Singapore order (i.e., that the customer was revealed to be American, and therefore, Coinbase Global Inc. was not the custodian of records). *See In re Ex Parte Application of Societe d'Etude de Realisation et d'Exploitation Pour Le*

*Traitement De Mais,* 2013 WL 6164435, at *4 (E.D. Pa. Nov. 22, 2013) ("The requests seeks information that will help Seretram identify and locate the fraudster and, ideally, trace the money that was stolen. The universe of responsive information is likely to be readily identifiable and easy to produce."). Accordingly, this factor also weighs in favor of granting the instant Application.

## CONCLUSION

Based on the foregoing, Applicant respectfully requests that this Court grant the instant Application in its entirety.

Dated: June 16, 2022

**BAYARD, P.A.**

*Of Counsel:*

Michael Jason Lee, Esq.
LAW OFFICES OF MICHAEL
JASON LEE, APLC
4660 La Jolla Village Drive, Suite 100
San Diego, California 92122
(858) 550-9984
michael@mjllaw.com

William James Kraus, Esq.
BUTZEL LONG, PC
301 East Liberty Street, Suite 500
Ann Arbor, Michigan 48104
(734) 995-3110
krausw@butzel.com

(*Pro Hac Vice Applications Forthcoming*)

*/s/ Brett M. McCartney*
Brett M. McCartney (No. 5208)
Elizabeth A. Powers (No. 5522)
600 North King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
bmmcartney@bayardlaw.com
epowers@bayardlaw.com

*Attorneys for Applicant Daniel Hindin*

16